Filed 11/12/14  P. v. Delosreyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048749 |
| v. | (Super. Ct. No. 09NF1571) |
| THOMAS ADOLPH DELOSREYES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Affirmed.

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne McGinnis and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Thomas Adolph Delosreyes was charged in an information with a deliberate and premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a); all undesignated statutory references are to this code), assault with a semiautomatic firearm (§ 245, subd. (b)), and active participation in a criminal street gang (§ 186.22, subd. (a)), based on an incident that occurred on June 3, 2009. It further alleged the attempted murder and the assault were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of those offenses, personally discharged a firearm in the commission of the attempted murder (§ 12022.53, subds. (d)) and personally used a firearm in the assault (§ 12022.5, subd. (a)). Lastly, the information alleged defendant suffered a prior "strike" conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)), a prior serious felony conviction (§ 667, subd. (a)(1)), and served a prior term in state prison (§ 667.5, subd. (b)).

A jury convicted defendant of attempted voluntary manslaughter (§§ 192, subd. (a), 664, subd. (a)) as a lesser and included offense of attempted murder, and found him guilty of assault with a semiautomatic firearm. The jury found defendant inflicted great bodily injury in committing the attempted manslaughter and the assault with a semiautomatic firearm, defendant personally used a firearm during the assault, and committed the assault for the benefit of a criminal street gang.[1] The jury was unable to reach a verdict on the substantive gang charge, a mistrial was declared as to that count, and the charge was ultimately dismissed. Defendant admitted he suffered a prior "strike" and serious felony conviction, and that he previously served a prior term in state prison.

The court sentenced defendant to a total term of 31 years, consisting of a middle term of six years on the assault, doubled because defendant suffered a prior "strike" conviction, plus consecutive terms of 10 years on the gang enhancement, four

---

[1] The jury found defendant did not commit the attempted manslaughter for the benefit of a criminal street gang.

2

years on the personal use of a firearm enhancement, and five years on the prior serious felony conviction enhancement.

Defendant contends the evidence does not support the attempted voluntary manslaughter conviction or the gang enhancement attached to the assault with a firearm conviction, and the trial court committed reversible error in admitting evidence of an assault he committed six years before the charged incident. We affirm.

I

FACTS

A. *The Shooting*

Irma Hernandez and her daughters Erica and Michelle lived in an apartment in Fullerton, in Baker Street's claimed gang territory. Michelle is an associate of the Baker Street gang. The girls shared a bedroom and on a nightstand was a notebook with "Baker Street West Side Fullerton" written on it.

Hernandez was friends with Brittney Shropshire who also lived in the same apartment complex. Just prior to 1:00 a.m. on June 3, 2009, Hernandez, Shropshire, and Shirley Duarte, another friend of Hernandez's, left Hernandez's apartment and went to Crown Liquor to buy beer. The liquor store was within walking distance. While in the store, Raymond Escobedo, who was loud, drunk, and wearing an Anaheim Angels hat entered and approached Duarte. He made inappropriate comments to her, including telling her to pull down her pants. Duarte responded by slapping Escobedo. He attempted to slap her back. Thinking he had, Shropshire told him, "Don't slap my home girl." Escobedo said he was from Anaheim and Riverside—gangs in either city would be rivals to Baker Street—and "F. . . Fullerton. F. . . Orange." He said he was going to "blast" the women, and reached toward his belt, causing Shropshire to fear he might have a gun. Hernandez telephoned her daughter Michelle and told her what happened at the liquor store.

3

The women returned to Hernandez's apartment. Defendant, Samuel Negrete, and Christopher Kelley were present. Like defendant, Kelley was a Baker Street gang member. Duarte was angry and explained what happened at the store. Defendant asked what the male looked like. Duarte said he was fat and had on a hat. Defendant then went into the bedroom closet and retrieved something shiny from a shoebox. Luis Barajas, who was in the bedroom, thought the object looked like a gun. Defendant left the room after he got the gun.

Defendant and Negrete then left the apartment. About 10 or 15 minutes after defendant left the bedroom, Barajas heard a gunshot. About five minutes later, defendant, Michelle and her cousin, Negrete, Kelley, and another male ran into the apartment out of breath. Defendant paced about and said either, "I had to shoot him," or "I had to blast him." Defendant said he knew it was the same male from the liquor store and he threw the gun away in the bushes.

Police responded to the apartment complex in response to a shots fired call. Escobedo was found on the ground near apartment 105. He had a gunshot wound to the right thigh. The bullet had entered his thigh, but appeared to have lodged in his scrotum. His hat was nearby, although the responding officer did not remember if Escobedo was wearing it when police arrived on the scene.

An expended .22-caliber shell casing was found in the entryway of the apartment complex and a .22-caliber semiautomatic handgun was located in the bushes. The gun was jammed. DNA from the firearm and its magazine matched defendant's profile.

B. *Gang Evidence*

The parties stipulated that as of June 3, 2009, the Baker Street gang was a criminal street gang; defendant knew members of the gang engaged in a pattern of criminal gang activity; defendant, whose moniker is "Little Rascal," is an admitted

4

member of the Baker Street gang; Victor Hernandez is a known Baker Street gang member; and defendant assaulted a rival gang member in 2003 with a filed down toothbrush for the benefit of the Baker Street gang. A detective testified defendant has been a Baker Street gang member since he was 13 years old. Defendant has a number of Baker Street tattoos, including on his face.

Fullerton Detective Jim Bolden testified as a gang expert. He is familiar with the Baker Street gang. He opined defendant and Kelley were active participants in the Baker Street gang on the date of the shooting. Bolden said writings found in Hernandez's apartment was in the style he has seen in other gang related writings. He added the fact that the gun was retrieved from a box in Michelle's closet is consistent with a female's role in the gang, hiding contraband or weapons, thereby showing allegiance to the gang. Bolden said Duarte is an associate of the Baker Street gang and her son is a documented Baker Street member.

Bolden said the Baker Street gang has no allies. Anaheim gangs are Baker Street rivals. He said a Baker Street member who shoots a rival in Baker Street territory would earn respect for the shooting. Backing up occurs when one member goes out to commit a crime and takes another gang member with him to back him up "in case for whatever contingency may arise to assist in any way."

The hypothetical question posed to Bolden asked him to assume: On June 3, 2009, three females, one of whom was an associate of the Baker Street gang, were in a liquor store in Fullerton when a male in a dark shirt and an Anaheim Angel's baseball cap, claiming Anaheim and Riverside, insulted the associate and threatened to "blast" the females. Bolden noted the liquor store was within Baker Street's claimed territory. The prosecutor added more to the hypothetical: After the incident at the liquor store, the females went to the residence of another female who was a Baker Street associate and contacted her and a male whose tattoos were consistent with Baker Street membership; the male was handed a .22-caliber firearm, left the residence accompanied by two other

5

male Baker Street gang members, and confronted the individual who had insulted the females; prior to the confrontation, "someone yells out Baker Street, and another person yells out Fullerton;" and the person who insulted the women was then shot in the thigh.

The prosecutor asked Bolden what facts he would point out as proving the shooting was gang related. Bolden said the facts included the victim "claiming to be a gang member" of a rival of Baker Street, the incident occurred in Baker Street territory, and members of the gang would not let an act of disrespect to a female associate of the gang go unanswered. He further pointed out the significance of the Baker Street members yelling out "Baker" or "Fullerton" lets the victim know who is doing the shooting and at the same time lets witnesses know it is a gang shooting and they should not interfere.

According to Bolden, defendant wore "typical gang attire" on the night of the shooting—long socks, baggie shorts, and a T-shirt. He added there would be adverse consequences from the gang for one who disrespects a gang member in the gang's territory.

The prosecutor asked Bolden if the fact that the victim wore a dark shirt and an Angels hat and claimed Riverside and Anaheim made it appear to be a gang-related incident. Bolden said the fact that the victim may have claimed an Anaheim gang and was wearing the Anaheim "A" on his hat, representing the City of Anaheim, made the incident appear to be gang related.

The prosecutor told Bolden to assume two individuals with the shooter were acting as back up. Bolden said that was consistent with a gang-related shooting. He said they were there not only to back up the shooter in the event they were needed, but also as witnesses to make sure details of the shooting got back to the gang and the shooter's reputation is bolstered for showing his willingness to shoot a member of a rival gang.

On cross-examination, the defense asked Bolden to assume the victim was not a gang member and that no one yelled out "Baker Street" or "Fullerton." Bolden was then asked if the shooting was done for the benefit of the Baker Street gang. He said he "would not rule it out," but based on the change in the hypothetical, "[i]t would need more investigation." When asked if he could not state a "hard conclusion" based on the defense's hypothetical, Bolden said he would "like to have more."

II

DISCUSSION

A. *Sufficiency of the Evidence*

Defendant contends the evidence does not support his conviction for attempted manslaughter or the true finding on the gang enhancement attached to his conviction for assault with a semiautomatic firearm. "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) In other words, the fact that the evidence could "'"reasonably be reconciled"'" with innocence does not permit an appellate court to reverse a conviction. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.)

7

### 1. *Attempted Manslaughter*

Manslaughter is an unlawful killing without malice. It is a lesser included offense of murder. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086.) Attempted manslaughter involves the unlawful attempt to kill a human being without malice aforethought. The crime requires the defendant commit (1) a direct but ineffectual act to kill a human being, (2) with the specific intent to kill, (3) and that the action taken to kill the individual was unlawful. (See *People v. Speight* (2014) 227 Cal.App.4th 1229, 1244; § 21a.)

Defendant contends the evidence does not support a necessary element of the crime. Specifically, he argues there was insufficient evidence he intended to kill Escobedo. He reasons that as he shot Escobedo but once, and that was in an area of the body unlikely to lead to death, the evidence does not indicate he intended to kill. He maintains that if he had wanted to kill the victim, there was nothing stopping him from shooting the victim more than once.

Of course the fact that the victim survived a shooting does not compel a conclusion the shooter did not intend to kill. "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with [an intent to kill]." (*People v. Smith* (2005) 37 Cal.4th 733, 742.) In the present case, there is reason to believe the shooting took place at close range. There appears to have been a confrontation and during the confrontation Escobedo told defendant he (Escobedo) was from Riverside.

Much is made of the fact the victim was shot in the thigh, rather than a place where the risk of death would be significantly higher, such as the chest or head. But we do not know where defendant was aiming. "The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' [Citation.] 'The fact that the shooter may have fired only once and then abandoned his

8

efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.' [Citation.]" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.)

We believe a reasonable jury could have found beyond a reasonable doubt defendant intended to kill Escobedo. Escobedo offended a female associate of the Baker Street gang. Defendant apparently shot the victim from close range immediately after hearing about the incident. Defendant fled immediately after shooting the victim. He tossed the firearm away while in flight. When recovered, police discovered it was jammed. The jury was free to infer the reason the victim was only shot once was because the gun jammed after the first shot.

Additionally, the fact that defendant fired once, hitting Escobedo in the thigh does not mean defendant is a good marksman and aimed for Escobedo's thigh. We are not presented with facts similar to a situation where a defendant standing over the victim shoots the victim in the knee and tells him it will be worse the next time. In such a situation, the defendant's careful aim at a stationary target, in conjunction with warning about future violence, strongly indicates the shooter's lack of an intent to kill. The location of the gunshot wound, however, does not compel the conclusion defendant did not mean to kill. In *People v. Ramos* (2004) 121 Cal.App.4th 1194, a defendant's conviction for attempted murder was upheld against a sufficiency of evidence challenge in a case where the defendant attempted to shoot into a car full of what he believed were rival gang members, but the gun misfired. (*Id*. at p. 1208.)

"[I]f the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance." (*People v. Arias* (1996) 13 Cal.4th 92, 162.) There is more here. Generally speaking, the intent to kill may "be inferred from the defendant's acts and the circumstances of the crime.

9

[Citation.]" (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) Here, those circumstances include Escobedo having insulted a female associate of defendant's gang in the gang's territory, while ostensibly claiming a rival gang and specifically insulting defendant's gang. It was reasonable for the jury to conclude defendant intended to kill Escobedo when defendant immediately obtained a loaded gun upon hearing what Escobedo had done and said, and rushed out to confront Escobedo.

In *People v. Vang* (2001) 87 Cal.App.4th 554, the appellate court stated the proof of intent to kill is "'"generally deemed sufficient if the *means* used by the defendant, and the surrounding *circumstances* make the crime *apparently possible*.' [Citation.]" (*Id*. at p. 564.) The circumstances surrounding the shooting in this matter make it eminently possible that Escobedo could have been killed as the result of the attack and shooting by defendant. As an appellate court, "our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946) and we need not be convinced of defendant's guilt to uphold the conviction (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1054). Because a reasonable jury could have concluded defendant intended to kill when he shot Escobedo, we reject defendant's claim of insufficient evidence.

2. *Gang Enhancement*

The Legislature has provided a gang enhancement when a felony has been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) To prove the enhancement applies in a given case, the crime must be demonstrated to be "gang related" (*People v. Albillar* (2010) 51 Cal.4th 47, 69). Of course, not every crime committed by a gang member is gang related. (*Id.* at p. 60.) Not only must the offense be gang related, but the defendant must have specifically intended to "promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

10

Cases rarely involve "direct evidence that a crime was committed for the benefit of a gang." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411.) Evidence the crime was committed for the benefit of a gang is often supplied by expert testimony. The Evidence Code permits one to testify as an expert if he "has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section186.22(b)(1). [Citations.]" (*People v. Albillar*, *supra*, 51 Cal.4th at p. 63.)

An expert may generally give his or her expert opinion based on a hypothetical question wherein the expert is asked to assume the truth of the facts stated in the question. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) For the opinion to have any value, the facts the expert is asked to assume are true must be supported by evidence admitted in the trial. (*Ibid.*) An opinion based on "assumptions which are not supported by the record" has "no evidentiary value." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.)

Defendant claims the gang enhancement cannot withstand scrutiny because the evidence fails to prove the assault was gang related or that he acted with the specific intent to benefit the gang. He contends that as no witnesses to the shooting testified, it is only through "sheer speculation" one could conclude the crime was gang related or that he specifically intended to benefit the Baker Street gang by shooting Escobedo. Additionally, in addressing Bolden's opinion that the crime benefitted the Baker Street gang, defendant points out certain facts recited in the hypothetical were not supported by

11

the evidence. For example, contrary to what the prosecutor asked Bolden to assume as true in the hypothetical question, no one in defendant's group yelled out "Baker Street" or "Fullerton" during the shooting incident. Defendant further argues the hypothetical was improper because it asked Bolden to assume a Baker Street member (defendant) left the residence of a Baker Street associate with a gun the gang associate gave him, "accompanied by two other male Baker Street gang members." Defendant claims there was no evidence to support the assumption he left with two male gang members.

Defendant is correct about the hypothetical's shortcomings. There was no evidence defendant or anyone with him at the scene of the shooting yelled "Baker Street" or "Fullerton." According to Bolden, the significance of the gang's name being called out during the attack is to let the victim know who is doing the shooting and at the same time let witnesses know they should not interfere because it is a gang shooting. Bolden was asked on cross-examination to assume no one yelled out "Baker Street" or "Fullerton." He was then asked if the shooting was done for the benefit of the gang. Bolden said he "would not rule it out," but based on the change in the hypothetical, "[*i*]*t would need more investigation*." (Italics added.) When asked if he could not state a "hard conclusion" based on the defense's hypothetical, Bolden said he would "like to have more."

The hypothetical was also flawed in asking Bolden to assume defendant left the residence with two other male gang members. There was no evidence he left with *two* male Baker Street gang members. While there was evidence Kelley was a gang member, there was no evidence Negrete was a gang member. A witness testified defendant left the house that night with Negrete and although the prosecutor asked if the witness saw defendant leave with Kelley, the answer was no. But there was evidence from which the jury could reasonably have inferred defendant left Hernandez's residence with Kelley. Kelley was at the residence when the story about the encounter at the liquor

12

store was told and he *returned* to the residence the same time as the defendant and out of breath from running, like defendant and those that returned with him.

Notwithstanding the flawed hypothetical question, the jury's true finding is supported by the evidence. Escobedo offended a female associate of the Baker Street gang on Baker Street's home turf. In doing so, he "claimed" Anaheim and Riverside, which was consistent with wearing an Anaheim Angels cap, as one from an Anaheim gang might. Anaheim gangs are rivals of Baker Street. Escobedo also threatened to "blast" the women. Additionally, Escobedo insulted Baker Street specifically, by stating, "F. . . Fullerton." Even if Escobedo was not a gang member, his actions spoke of gang membership. Bolden said the fact that the victim "may have claimed to have been an Anaheim gang member" and wore "the Anaheim 'A' representing the City of Anaheim," suggests the shooting was gang related. Based on the testimony of Bolden, one would not expect Escobedo's insults to go unanswered by the insulted gang, even if we discount the answer to the flawed hypothetical.

Defendant left Hernandez's residence with a gun and went looking for Escobedo. He left with at least one other male gang member (Kelley) and one female associate (Michelle) of the gang. There is every reason to believe they were with him when he confronted Escobedo, because after the shooting they returned to the residence as a group, each breathing hard from running, presumably from the scene of the shooting.[2] "'Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime.' (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; see also *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ['very fact that defendant committed the charged crimes in

---

[2] Kelley, too, had been charged in the shooting of Escobedo and pled guilty to assault with a deadly weapon in that matter.

13

association with fellow gang members' supports the enhancement].)" (*People v. Miranda*, *supra*, 192 Cal.App.4th at p. 412.)  Here, the evidence indicates defendant went to confront Escobedo with another gang member and an associate of the gang.  In *Miranda*, like defendant here, the defendant committed his crime in the presence of a fellow gang member and an associate of the same gang.  (*Id*. at p. 405.)  Relying on the above-quoted language in *People v. Villalobos*, *supra*, 145 Cal.App.4th 310, the *Miranda* court upheld the jury's true finding on the gang enhancement.  (*People v. Miranda*, *supra*, 192 Cal.App.4th at pp. 411-413.)

        The evidence supports the jury's true finding on the gang enhancement despite deficiencies in the prosecutor's hypothetical question.  Accordingly, we reject defendant's sufficiency of the evidence challenge.

## C.  *Admission of Evidence*

        Prior to the taking of evidence, defense counsel brought up the issue of defendant's 2003 conviction for assault with a deadly weapon as the result of an assault on a fellow inmate with a sharpened toothbrush.  The court's initial response was the conviction could be used to impeach the defendant if he testified and would also be admissible to show defendant's connection to Baker Street, if the earlier assault was gang related.  The court noted the prior conviction occurred in 2003 and the present offense occurred in 2009, so the prior was not so remote as to render its introduction improper.  The court stated the expert should be permitted to testify he is aware defendant has admitted to being a gang member, but the *conviction* was not relevant.  Defense counsel then requested the jury be given the following instruction:  "On March 4, 2003, defendant . . . admitted to assaulting Jonathan Flores, a rival gang member, with a plastic toothbrush which was filed down to have an edge for the benefit of Baker Street gang with the intent to promote, further, or assist criminal conduct by the gang."  The court agreed and instructed the prosecutor not to get into the guilty plea form or the prior conviction.  The

14

court said the probative value of the evidence was not substantially outweighed by any prejudicial effect of the evidence. (See Evid. Code, § 352 [court may exclude evidence when its probative value is substantially outweighed by undue prejudice].)

Later that afternoon, as part of a rather extensive stipulation, defendant stipulated he had "admitted under penalty of perjury to assaulting Jonathan Flores, a rival gang member, with a plastic toothbrush which was filed down to have an edge, and did so for the benefit of the Baker Street gang with the intent to promote, further, or assist in criminal conduct by members of that gang." A week later, the court read the stipulation into evidence without objection.

Defendant now contends the court prejudicially erred in admitting evidence of his prior assault. "'". . . Evidence Code section 352 authorizes the trial court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]" [Citation.]'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1200.) We review a trial court's decision to admit evidence for an abuse of discretion, and reverse only if "it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

Defendant argues that once he stipulated to being a gang member and knowing about the activities of its members, evidence of his prior assault was inadmissible to prove his membership and knowledge of the activities of the gang's members. The factual predicate for his argument—that he had earlier stipulated to being a gang member and knowing of the activities of other gang members—does not exist. Evidence of defendant's prior assault was not admitted *after* he stipulated to being a gang member and knowing of the activities of Baker Street gang members. It was part and parcel of the *same* stipulation. Additionally, the stipulation was entered into after the court had ruled on the admissibility of evidence concerning the prior assault. Thus, the

15

court did not have such a stipulation before it at the time the court ruled on the admissibility of the evidence of the prior assault.

The evidence was admissible all the same. Yes, defendant admitted he was a member of the gang and knew of the activities of other members, but he did not stipulate to *actively participating* in the gang, an element of the offense charged in count three. (*People v. Johnson* (2013) 57 Cal.4th 250, 259 [section 186.22, subd. (a) requires proof of "active participation" in the criminal street gang]; see *People v. Rodriguez* (2013) 55 Cal.4th 1125, 1133 [statute does not punish mere membership in gang].) The evidence was admissible as tending to prove defendant's attachment to the gang and that he actively participates in the gang.

Even had the court erred in its ruling, any error would have been harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The court did not permit the jury to hear defendant had been convicted in the prior incident, or the details of the assault, other than it involved a sharpened toothbrush and was committed for the benefit of defendant's gang. The evidence of the identity of the shooter in this matter was overwhelming, as was evidence the shooting was gang related: Escobedo disrespected a Baker Street gang associate on the gang's home turf; Escobedo seemed to claim membership in a rival Anaheim gang, wore a baseball hat indicative of an Anaheim gang, specifically insulted the Baker Street gang, and acted as if he had a gun on his person; defendant, another Baker Street gang member, and at least one associate of the gang, learned of the incident immediately; the associate gave defendant a gun; and defendant immediately ran off to confront Escobedo.

16

III

DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.